# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RAFAL BADRI | ) | CASE NO. 1:08CV1913 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| HURON HOSPITAL, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Plaintiff Rafal Badri, M.D. (Plaintiff or Dr. Badri) filed the present action against Defendants, Huron Hospital, Cleveland Clinic Health System, Gus Kious, M.D., Philbert Jones, M.D., and Bev Lozar, R.N. (collectively "Defendants"), challenging the revocation of his medical privileges at Huron Hospital.

Pursuant to Fed. R. Civ. P. 56(c), Defendants seek summary dismissal of all claims in Plaintiff's Amended Complaint. (Doc. No. 66.) The motion is fully briefed and ripe for decision.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The details of Plaintiff's association with Huron Hospital prior to November of 2002 are not in dispute. Dr. Badri graduated from medical school in 1976 in Iraq. (Badri Dep. at 456.) He is a board-certified general surgeon and a Fellow of the American College of Surgeons. (Doc. No. 8, Am. Compl. ¶ 3.) After completing a

general surgical residency at Huron Hospital, Dr. Badri was awarded clinical privileges at Huron in 1987. (Am. Compl. at ¶ 8.)  He was eventually posted to the position of Trauma Director. (*Id.*)

On November 4, 2002, Dr. Badri was involved in an automobile accident. The record shows that, after being rear ended by another driver on the road, Dr. Badri "tailed" the other driver and forced him to pull over. (Doc. No. 74, Deposition of Dr. Rafal Badri at 111-113; Doc. No. 74.) After exiting their vehicles, Dr. Badri claims that the other driver choked him. (Badri Dep. at 120.). For his part in the incident, Dr. Badri was eventually charged with, and convicted of, disorderly conduct. (Doc. No. 71, Reply, Ex. CC.) According to Dr. Badri, the accident and resulting assault left him with severe pain in his neck and neck spasms. (Badri Dep. at 96.)

Following the accident, Dr. Badri also began to experience migraine headaches. (*Id.* at 158.) To alleviate the pain, Dr. Badri began to self-administer various medications, including steroids and drugs known as triptins. (Doc. No. 66, Ex. O, Report of Dr. Richard Lightbody at 2; Badri Dep. at 246.) Because he wished to "cover his trail" by not leaving evidence that he was taking prescription medication (Badri Dep. at 101-102), Dr. Badri relied on sample medications to which had access through his medical practice. (*Id.* at 154.) He also "unofficially" sought out medical advice and free samples from friends and colleagues. (*Id.* at 88, 101-102; Lightbody Report at 2.)

Plaintiff's attempts to self-medicate and control his pain lead to drug abuse. He attributed his overuse of steroids to the development of a condition known as Cushing's Syndrome, which Plaintiff claims resulted in an appearance of puffiness in his

2

face, and left him without energy or the desire to interact with others. (Badri Dep. at 151, 160, 185, 289.) Dr. Badri maintains that he also suffered from bouts of depression and entertained thoughts of suicide. (Badri Dep. 91, 101, 185, 549.)

Dr. Badri was ultimately involved in a series of incidents at Huron Hospital that would serve as the impetus to the revocation of his clinical privileges. On August 13, 2003, Dr. Badri arrived at the GI Laboratory of Huron Hospital, where he was scheduled to perform an endoscopic surgical procedure. Upon his arrival, Dr. Badri was informed that the room in which he was to perform his procedure was not yet available because it was still in use by another physician. (Doc. No. 66, Ex. B, Suster Memorandum dated August 14, 2003.) Expressing his displeasure at the inconvenience, Dr. Badri advised all who were present in the GI lab—including nurses and his own patient—that "they [administration]  only care about the professors [teaching physicians] and not him." (*Id*.; Badri Dep. at 400.)  While Dr. Badri denies that he raised his voice (Badri Dep. at 403-404), he admits both that he openly criticized the hospital administration (*Id*. at 400), and that his behavior was inappropriate. (*Id*. at 450.)

On September 25, 2003, Dr. Badri placed a call to Lori Slusarki, Huron's Coordinator of Medical Staff Services, seeking confidential information about another physician at Huron Hospital. (Doc. No. 66, Ex. D, September 25, 2003 Memorandum of Lori Slusarski; Badri Dep. at 74.) By this phone call, Dr. Badri wished to obtain information to sustain his suspicion that his colleague was abusing drugs. It appears from the record that he wished to use this information against the physician in an unrelated lawsuit. (Badr Dep. at 74, 410, 427-428.) Ms. Slusarski told Dr. Badri that she was

unaware of any issues with this particular physician. In a Memorandum memorializing the call, Ms. Slusarski noted that she was "reluctant" to advise Dr. Badri that his request for another physician's confidential information was inappropriate because she had encountered problems with Dr. Badri in the past "and []didn't want to incur his anger again." (Doc. No. 66, Ex. D, Slusarki Memo.)

The following day, Dr. Badri chastised a medical resident who had removed a patient's chart in which he was planning to write. (Doc. No. 66, Ex. F, October 8, 2003 Memo. of Dr. Keyvan Ravakhah; Badri Dep. at 135.) The head of the resident program, Dr. Keyvan Ravakhah, later described Dr. Badri's behavior as "completely out of line for what [he] consider[ed] a simple misunderstanding." (Ex. F.) Dr. Badri admits that he may have yelled during the encounter. (Badri Dep. at 441.) He subsequently spoke with Dr. Ravakhah and offered to apologize to the resident. (*Id*. at 135.)

On October 16, 2003, Dr. Badri discussed a patient's drug addiction in front of other patients and hospital staff. (Badri Dep. at 135, 428-437; Doc. No. 66, Ex. G, Incident Report.) While Dr. Badri admitted that he had this conversation with the patient in front of the nurses' station, he maintains that the patient followed him out of her hospital room and "hounded him" for narcotics. (Badri Dep. at 433-434.)

By a letter dated November 21, 2003, Dr. Badri was advised that the Medical Executive Committee (MEC) and the Huron Hospital Administration had "received numerous complaints that [he] had been engaging in disruptive and harassing conduct directed toward Hospital employees, residents and patients." (Doc. No. 66, Ex.

H, Letter from Pamela Redden, Chief of Staff, and Beverly Lozar, Chief Operating Officer of Huron Hospital.) According to the letter, the complaints had been forwarded to Huron's Department of Surgery for investigation, and the results of the investigation confirmed that Dr. Badri had engaged in "rude or abusive conduct" toward staff and patients. (*Id.* at 1.) The letter directed Dr. Badri to sign a Code of Conduct, which set forth the Hospital's expectations for his future interactions with doctors, staff, patients, and visitors. The letter also demanded that Dr. Badri submit to a full psychological examination. Following the examination, he would be expected to participate in any recommended treatment program. Dr. Badri was advised that failure to comply with the terms of the Code would result in the suspension of his clinical privileges. (*Id.* at 2.)

Dr. Badri did not immediately sign the Code of Conduct. Instead, the following day, Dr. Badri responded in writing to Dr. Redden. (Doc. No. 71, Ex. Y.) In the letter, Dr. Badri complained that he was not being treated fairly, and he accused the MEC members of having a "hidden agenda." (*Id.*) No mention was made of any disability, and the letter contained no request for a reasonable accommodation.

On December 9, 2003, Dr. Badri's office manager, Debbie Morgan, sent a letter to Dr. Chung, Director of Surgery for Huron. In her letter, Ms. Morgan explained that Dr. Badri's "dramatic personality changes" were the result of Cushing's Syndrome, which related back to the 2002 accident and Dr. Badri's over-use of steroid medication. (Doc. No. 66, Ex. H.) Appended to her letter were medical reports from three of Dr. Badri's treating physicians. (*Id.*) The letter did not include any request for a reasonable accommodation. To the contrary, Ms. Morgan represented that Dr. Badri was

"appropriately dealing with said problem." (*Id.*) The MEC reviewed Dr. Badri's medical records and found that they were "suggestive of steroid over medication and did not include any psychological information," and concluded that the records did not provide an adequate basis to assess any possible impairment. (Doc. No. 66, Ex. K, Memo from Dr. Chung.)

Dr. Badri's endoscopic privileges were suspended on January 8, 2004, following two reports of negative patient outcomes from endoscopic procedures.[1] (Doc. No. 68, Ex. 2.) On January 14, 2004, Ms. Morgan sent a second letter to Dr. Chung, this time challenging the suspension of Dr. Badri's endoscopic privileges. The letter disputed the decision, and urged Dr. Chung to review certain medical literature on complications resulting from endoscopy. Again, no mention was made of a need for any accommodation to assist Dr. Badri in performing his surgical duties.

Following a meeting on February 4, 2004, the MEC announced its decision to indefinitely suspend Dr. Badri's privileges to perform endoscopic procedures. (Doc. No. 66, Ex. L, February 4, 2004 letter from Raja Shekar, Huron Chief of Staff, and Beverly Lozar.) According to the notice received by Dr. Badri, the decision was based upon the recent negative endoscopic patient outcomes and Dr. Badri's failure to sign the Code of Conduct and submit to a psychological evaluation. The letter also advised Dr. Badri of his right to appeal the suspension.

---

[1] The decision came after an Ad Hoc Committee was convened to review the negative patient outcomes and prepare a report. (Doc. No. 66, Ex. L.) The report, which contained a recommendation for suspension, was presented to the MEC.

Dr. Badri signed the Code of Conduct on February 6, 2004 (Doc. No. 66, Ex. M), and agreed to submit to a psychological evaluation by Dr. Richard Lightbody. After several sessions with Dr. Badri, Dr. Lightbody issued a report wherein he opined that Dr. Badri suffered from Dysthymic Disorder, a chronic condition. (*Id*. at 3.) Dr. Lightbody found, however, that Dr. Badri was not chemically dependent, based, in part, on Dr. Badri's representation that he had weaned himself off steroids. (*Id*. at 2.) Dr. Lightbody also found "no sign of behavioral instability or emotional liability."[2] (*Id*. at 3.) He would later testify that he believed Dr. Badri was adequately functioning in his position, and that there was "no reason to think his surgical or clinical skills were impaired." (Doc. No. 66, Ex. N, Deposition of Dr. Richard Lightbody at 34.)

Though his endoscopic privileges had been suspended, Dr. Badri continued to enjoy general clinical privileges at Huron until May of 2004. On May 13, 2004, Dr. Badri was heard complaining in a loud voice that "in order to get promoted around here, Bev Lozar says you have to screw physicians." Dr. Badri was later observed standing behind Dr. Ravakhah and motioning as if to stab him in the back, and making a "very rude motion as if to have something inserted in Dr. Ravakhah's behind." (Doc. No. 66, Ex. C, Deposition of Vicki Suster at 27-47; Ex. O, Memo. of Dr. Ravakhah; Ex. P, Memo. of Vicki Suster.) Dr. Badri testified at his deposition that he made the comment regarding Ms. Lozar, but explained that he was simply venting his frustration over nurses participating in the filing of incident reports against physicians. (Badri Dep. at 617, 619,

---

[2] Dr. Lightbody did recommend that Dr. Badri pursue ongoing psychotherapy, but Dr. Badri indicated that he was unwilling to do so. (Lightbody Report at 3.)

7

659.) He further testified that he was at the "heights of [his] psychosis" (Badri Dep. at 608) over the fact that nurses had been issuing complaints against him in particular. He also admitted that he made the back stabbing motion behind Dr. Ravakhah, though he denied making the other gesture. (Badri Dep. at 661, 700.)

On May 19, 2004, the MEC, at its regularly scheduled meeting, considered Dr. Badri's apparent violation of the Code of Conduct. The MEC determined that his behavior on May 13, 2004 was "rude, aggressive and unprofessional." (Doc. No. 66, Ex. S, May 19, 2004 letter from Dr. Shekar and Michael Trainer, Interim Chief Administrative Officer.) Finding his behavior to be a clear violation of the Code of Conduct, it was the "unanimous" conclusion of the MEC that all of Dr. Badri's clinical privileges should be temporarily suspended while additional corrective action was considered. (*Id*.)

A committee was formed to consider what additional steps should be taken against Dr. Badri. This committee, after meeting with Dr. Badri and his counsel, recommended the permanent revocation of Dr. Badri's privileges. The MEC and Huron Hospital accepted the recommendation and informed Dr. Badri. At a special meeting of the MEC on June 3, 2004, the MEC terminated Dr. Badri from the medical staff of Huron Hospital. (Doc. No. 66, Ex. T.)

Dr. Badri challenged this decision and, pursuant to Article XII of the Huron Medical Staff Bylaws, a Fair Hearing Committee was appointed by the MEC to hear the appeal. (Doc. No. 66, Ex. V at 45.) The evidentiary portion of the Fair Hearing was conducted on October 20, 2004 and December 14, 2004. Dr. Badri was represented

by counsel, and afforded the opportunity to make a record of the proceedings and to submit a written statement at the close of the hearing.[3] The Fair Hearing Panel affirmed the MEC's revocation. Following Badri's further appeal, the Medical and Regulatory Affairs Committed affirmed the decision of the MEC and the Fair Hearing Committee. (Doc. No. 66, Ex. U.)

Plaintiff filed the present action on August 8, 2008.[4] In his Amended Complaint, Dr. Badri alleged that Defendant Huron Hospital violated Title III of the Americans with Disabilities Act (ADA), 42, U.S.C. § 12182(a), and the Rehabilitation Act (RA), 29 U.S.C. § 7921(a). He also brought state law claims of intentional infliction of emotional distress, civil conspiracy, and tortuous interference with existing and prospective contract relationships against all defendants, and brought additional state law claims of negligence in peer review, defamation, breach of contract, and promissory estoppel against Huron Hospital. (*See* Doc. No. 8, Am. Compl.) With respect to his disability claims, Plaintiff alleges that Huron Hospital discriminated against him on the basis of his disabilities and failed to reasonably accommodation those same disabilities.

## II.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings,

---

[3] He was also permitted to chose the date of the hearing, and approve the panel of physicians who would preside over the hearing.

[4] Plaintiff had previously filed an action in this Court on February 2, 2006, also challenging the revocation of his medical privileges. This prior action, Case No. 1:06cv294, was voluntarily dismissed without prejudice on August 15, 2007.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. […]

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. […] The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most

10

civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

### III.

### LAW AND ANALYSIS

***Disability Discrimination***

Plaintiff alleges that the revocation of his medical privileges constituted unlawful disability discrimination under the ADA and the RA. "Because the ADA sets forth the same remedies, and procedures, and rights as the Rehabilitation Act, *see* 42

U.S.C. § 12133, claims brought under both statutes may be analyzed together."
*Thompson v. Williamson County*, 219 F.3d 555, 557 n.3 (6th Cir. 2000).

Title III of the ADA prohibits discrimination regarding the use of public accommodation. Specifically, Title III provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of accommodation.

42 U.S.C. § 12182(a). An individual seeking the protection of Title III must prove that he was deprived the full benefit of a public facility because of his disability, and that he is disabled under the ADA[5]. *Douris v. Dougherty,* 192 F. Supp. 2d 358, 368 (E.D. Pa. 2002). *See Menkowitz v. Pottstown Mem. Med. Ctr.*, 154 F.3d 113 (3rd Cir. 1998). For purposes of summary judgment, Defendants have not raised an issue as to whether Huron Hospital is a place of public accommodation, or whether Plaintiff, as a physician working in a hospital, may seek the protection of Title III.

Under the ADA, a plaintiff may purse a claim for disparate treatment or for a failure to accommodate. A disparate treatment claim follows the *McDonnell Douglas* burden shifting analysis, while a different approach is reserved for failure to accommodate claims. *Boice v. Southeastern Pennsylvania Transportation Authority,* 2007 U.S. Dist. LEXIS 74566, at *40 (E.D. Pa. Oct. 5, 2007) (citing *Ferreri v. Mac*

---

[5] A similar showing is required of a plaintiff under the Rehabilitation Act: (1) the person is a "handicapped person" under the Act; (2) the plaintiff is "otherwise qualified" for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) the relevant program is receiving federal aid. *Maddox v. University of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995).

*Motors, Inc*., 138 F. Supp. 2d 645, 651 n.1 (E.D. Pa 2001)). In the present case, Plaintiff has alleged both disparate treatment and a failure to accommodate. Before he can recover under either theory, however, he must establish that he is "disabled" under the ADA.[6] To qualify, he must "(1) have a physical or mental impairment which 'substantially limits' him or her in at least one 'major life activity,' (2) have a record of such an impairment, or (3) be regarded as having such an impairment." *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) (citing 42 U.S.C. § 12102(2)). Whether a claimed affliction constitutes an impairment under the ADA and whether the impairment substantially limits one or more major life activities is a question of law for the Court. *Poindexter v. Atchison, T. & S.F. Ry*., 168 F.3d 1228, 1230 (10th Cir. 1999).

Under the regulations, a "physical impairment" includes "any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitor-urinary, hemic and lymphatic, skin and endocrine." 29 C.F.R. § 1630.2(h)(1). A mental impairment, in turn, is defined as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

---

[6] In 2008, Congress passed legislation that expanded the definition of "disabled" for purposes of the ADA. "The ADA Amendments Act of 2008, which became effective on January 1, 2009, Pub. L. No. 110-325, § 8m 122 Stat. 3553, does not apply retroactively to govern conduct occurring before the Act became effective." *Milholland v. Sumner County Bd. of Educ*., 569 F.3d 562, 566 (6th Cir. 2009). *See Thorton v. U.P.S., Inc*., 587 F.3d 27, 35 (1st Cir. 2009). The ADA Amendments Act is, therefore, inapplicable to the present case.

13

Plaintiff alleges that his Cushing's Syndrome, Dysthymic Disorder, depression, and migraines, have, separately and presumably in combination, rendered him disabled under the ADA. Combining ailments is allowed under the applicable regulation: "[m]utiple impairments that combine to substantially limit one or more of an individual's major life activities also constitute a disability. Some impairments may be disabling for particular individuals but not for others, depending on the presence of other impairments that combine to make the impairment disabling." 28 C.F.R. Pt. 1630, app. § 1630.2(j).

Courts have found depression, and depression related illnesses, to constitute mental impairments under the ADA. *See, e.g., Smoke v. Wal-Mart Stores, Inc.*, 2000 U.S. App. LEXIS 2478, at *8 (10th Cir. Feb. 17, 2000) (plaintiff's major depression qualified as a mental impairment under the federal regulations). Likewise, migraine headaches can constitute a recognized impairment under the ADA. S*ee, e.g., Rosteutcher v. MidMichigan Physicians Group*, 332 F. Supp. 2d 1049, 1060 (E.D. Mich. 2004) (migraines, coupled with seizures, constituted qualifying impairments.) The diagnosis of a qualifying impairment alone, however, is not enough to establish disability under the ADA, as a plaintiff must prove that the impairment substantially limits his individual abilities in one or more major life activities. According to the EEOC regulations, "substantially limit[ed] means '[u]nable to perform a major life activity that the average person in the general population can perform;' or '[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average

14

person in the general population can perform the same major life activity." 29 C.F.R. §
1630.2(j). Finally, "major life activities means functions such as caring for oneself,
performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and
working. This is not an exhaustive list. For example, other major life activities include,
but are not limited to, sitting, standing, lifting and reaching." *Id*. The Court must make an
individualized inquiry to determine what effect the claimed impairment has on the life of
the individual claiming the protection of the ADA. *Cotter v. Ajilon Servs.,* 287 F.3d 593,
598 (6th Cir. 2002).

   Plaintiff fails to identify any particular major life activity that has been
impacted by his alleged impairments, leaving Defendants and the Court to guess.[7] The
Court is not obligated to comb the record in search of support for Plaintiff's case. *Street*,
886 F.2d at 1479-80.  Nonetheless, Plaintiff's deposition testimony would suggest that he
believes that the major life activities affected by his impairments would include sleeping,
getting along with others, caring for himself, and working.

   Plaintiff testified that, as a result of his impairments, he experienced
"some problems with sleep and pattern of sleep." (Badri Dep. at 184.) He also testified
that "[a]s far as taking care of my needs at home, I know I'm falling behind." (*Id*. at 192.)
By way of example, Plaintiff noted that while he used to take a shower every day, "I
started trying to put it to every other day, if not every third day…." (*Id*.) Plaintiff's
observations about his sleep patterns and hygiene habits are insufficient to qualify his

---

[7] In his Memorandum in Opposition to Summary Judgment, Plaintiff merely states that the "significance"
of his multiple impairments and the "correlating symptoms of Dr. Badri is that they significantly interfered
with his normal daily life activities and were disabling to Dr. Badri." (Doc. No. 68, Memo. in Opp. at 3.)

disabilities. "Generalized complaints" about sleep have been found insufficient to establish a substantial limitation. *Smoke*, 2000 U.S. App. LEXIS 2478, at *15. Further to prove that one is disabled in the major life activity of caring for oneself, a plaintiff "must establish that he is limited 'to a large degree' in the life activity of caring for [him]self." *Smith v. Grattan Family Enters., LLC*, 2009 U.S. Dist. LEXIS 101305, at *25-*26 (E.D. Mich. Oct. 30, 2009) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999)). Cutting back on showering simply does not rise to the level of limiting to a large degree the ability to care for oneself.[8] *See Verhoff v. Time Warner Cable, Inc.,* 299 Fed. Appx. 488, at *9 (6th Cir. 2008) (eczema limiting the taking of routine showers is not a substantial limitation on a major life activity).

There is some dispute as to whether getting along with others is considered a major life activity. *See Soileau v. Guilford of Maine*, 105 F.3d 12, 15 (1st Cir. 1997) (suggesting that getting along with others is not a major life activity). *But see McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999) ("Because interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity.'") Even assuming the existence of this major life activity, Plaintiff cannot establish that it has been substantially limited by his impairments. "This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people—at the most basic level of these activities.

---

[8] To the contrary, Plaintiff testified that he was able to "get[] out of bed in the morning, go[] and see[] patients and tak[e] care of the medical part of my life [...]." (Badri Dep. at 191.)

The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited by whose communication is inappropriate, ineffective, or unsuccessful." *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 203 (2nd Cir. 2004). *See, e.g., Grizzle v. Macon County,* 2009 U.S. Dist. LEXIS 73769, at *23 (M.D. Ga. Aug. 20, 2009) (an abrasive attitude and "personality conflicts" insufficient to establish a qualifying disability). *See McAlindin,* 192 F.3d at 1235 ("[M]ere trouble getting along with coworkers is not sufficient to show a substantial limitation.")

Plaintiff's observation that he was having problems with his "personality and [his] judgment and the way [his] statements were coming out […]." (Badri Dep.. at 603), does not rise to the level of a qualifying disability. While Plaintiff may not always have been able to exercise discretion in his conversation, and his discourse with others may not always have been entirely appropriate, there is no evidence that he was incapable of communicating with others.

He also testified, however, that he had no social life and was becoming an "introvert." (Badri Dep. at 184.) Extreme isolation resulting from a severe condition can support a finding that an individual cannot interact with others. *McAlindin,* 192 F.3d at 203-204. In *McAlindin*, the plaintiff submitted medical evaluations suggesting that he "became increasingly withdrawn and his ability to deal with people and stress was severely diminished." *Id.* at 1235. He spent at least twenty hours per day at home, and he avoided most activities "for fear that they will make him more anxious." *Id.* Based on these facts, the Ninth Circuit found the limitation on interacting with others "sufficiently

17

severe to raise a genuine issue of material fact" as to whether the plaintiff was disabled. *Id*. at 1235-36.

In contrast, Plaintiff testified that he was still able to get out of bed each morning and go to work, where he would tend to his patients and interact with staff. (Badri Dep. at 191.) The fact that Plaintiff had little or no social life, and was beginning to withdraw, without more and without any analysis as to the extent of these difficulties, does not rise to the level of a disability. *See Soileau*, 105 F.3d at 15 (employee's dysthymia, a chronic depressive disorder, did not substantially limit the assumed major life activity of "getting along with others"); *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 276 (4th Cir. 2004) (problems with social interaction not "sufficiently severe" to establish a substantial limitation); *Smoke*, 2000 U.S. App. LEXIS 2478, at *17 (Plaintiff's claim that she had little or no social life and believed people did not like her was insufficient to establish a qualifying disability).

Finally, the Court finds that there is insufficient evidence from which a jury could conclude that Dr. Badri was substantially limited in his ability to work. Plaintiff has failed to come forward with any evidence to support the position that he is substantially limited in performing the tasks of a surgeon. He testified that he was seeing patients six days a week. (Badri Dep. at 194.) He also testified that the number of outpatient surgeries he performed in 2003 actually increased. (Badri Dep. at 169.) Finally, he stated that if a migraine or neck or back pain came on suddenly during a surgical procedure, he would still be able to work through the pain and complete the procedure. (Badri Dep. at 181.) Clearly, Plaintiff's "work history belies any argument of

18

being substantially impaired in the life activity of working." *Richards v. American Axle & Mfg., Inc.*, 84 F. Supp. 2d 862, 870 (E.D. Mich. 2000).

There can be no doubt that migraine headaches and neck pain and spasms can cause severe discomfort. Doubtless, too, depression can affect one's mood and the ability to enjoy the company of others. Yet, the testimony in Plaintiff's deposition merely establishes that these conditions are impairments, not that they substantially limit any major life activities. As courts have consistently noted, the "substantially" requirement is meant to enforce the ADA's narrow definition of a qualifying disability. *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005). "The ADA, in other words, does not protect those who are impaired or in pain unless they are truly disabled […]." *Beier v. Hoffmaster Co.*, 2006 U.S. Dist. LEXIS 85110, at *12 (E.D. Wis. Nov. 17, 2006) (migraine headaches did not rise to the level of a qualifying disability). Plaintiff simply has not come forward with evidence to show that any major life activities have been substantially limited by his various impairments and, therefore, cannot make out a *prima facie* case of disability discrimination.

If Plaintiff had succeeded in establishing a *prima facie* case, the burden would have shifted to Defendants to offer a legitimate, non-discriminatory reason for the revocation of privileges. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Defendants easily satisfy this minimal burden by stating that Dr. Badri's repeated bad behavior and violation of the Code of Conduct were the basis for the decision to remove him from the staff at Huron Hospital.

Plaintiff challenges this stated reason by noting that his "conduct, which was solely a result of his disability, is the reason why the Defendants terminated [him]." (Memo. in Opp. at 12.) What Plaintiff fails to realize is that "there is a distinction between taking an adverse [action] for unacceptable misconduct and taking such action solely because of a disability, even if the misconduct is "caused" by the disability." *Martin v. Barnesville Exempted Village Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir. 2000) (citing *Maddox*, 62 F.3d at 847). *See Hamilton v. Southwestern Bell Tel. Co*., 136 F.3d 1047, 1052 (5th Cir. 1998) ("The ADA does not insulate [employees from] emotional or violent outbursts blamed on an impairment.") *See, e.g., Seitz v. Lane Furniture Indus*., 2008 U.S. Dist. LEXIS 79651, at *48-*49 (N.D. Ohio Sept. 17, 2008) (discharge of employee suffering from alcoholism for repeated customer complaints was a legitimate reason despite the fact that the poor performance was the result of alcoholism).

Defendants having met their burden of production, the burden would then shift back to Plaintiff to demonstrate that the articulated reason was merely a pretext for unlawful disability discrimination. *See Burdine*, 450 U.S. at 253. Plaintiff attempts to meet this burden by offering evidence of similarly-situated employees receiving better treatment. Plaintiff states, without proof, that "Huron Hospital has a long history of working with staff physicians with disabilities." (Memo. in Opp. at 9.) He then points to one unidentified surgeon who continued to practice at Huron Hospital while under conditional licensing due to an addiction problem. (*Id.*) The Court has no basis for comparing the circumstances surrounding this allegedly "similarly-situated" surgeon

20

because Plaintiff has failed to come forward with any evidence to suggest that the situation of this unidentified surgeon was even remotely similar to that of Dr. Badri's. Indeed, nothing is known about the nature of the other physician's conduct, or even if he did have a substance abuse problem.[9] Under these circumstances, a stray reference to an unknown similarly-situated individual cannot carry the burden of establishing pretext.[10] *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (comparing individual must be "similarly situated in all relevant respects").

      Plaintiff also makes much of the fact that Dr. Kious inaccurately testified in his deposition that Dr. Badri's endoscopic privileges were suspended after full review of the psychological evaluation performed by Dr. Lightbody. (Kious Dep. at 30.) In actuality, the psychological evaluation occurred months after the January 8, 2004 suspension of Dr. Badri's endoscopic privileges. This inadvertent miscue adds nothing. The record is clear that the final decision to remove Dr. Badri from the staff at Huron Hospital was based upon Plaintiff's admitted behavior. (Doc. No. 66, Ex. S.)

      Plaintiff has failed to come forward with even a scintilla of evidence that

---

[9] Plaintiff turns to the deposition testimony of Defendant Gus Kious, M.D. for support. (Doc. No. 68, Ex. 8.) The cited pages, however, offer no details as to the unidentified surgeon. In fact, it appears from what little text of the deposition that is provided that the "incidents" involving Dr. Badri and the other surgeon revolved around negative patient outcomes in endoscopy procedures, rather than misconduct arising out of drug abuse. (Kious Dep. at 34, 38.)

[10] Plaintiff also alleges that Defendants "began a process to find a false premise to remove Dr. Badri" after they learned that he was filing complaints over billing practices at Huron Hospital with the U.S. Department of Health and Human Services and other agencies. (Memo. in Opp. at 4.) He also claims that, due to his disability, he lacked the capacity to sign and be held to the Code of Conduct. As to the prior argument, Plaintiff fails to support his whistleblower theory with any evidence. As to the later, even if Plaintiff did lack the capacity to sign the Code, such evidence would fail to demonstrate that Defendants' reason for revoking his privileges was a pretext.

21

would support his disparate treatment claims under the ADA and the RA.[11] Accordingly, Defendants are entitled to summary judgment on these claims.

### Failure to Accommodate

Plaintiff also maintains, however, that Huron Hospital failed to reasonably accommodate his alleged disabilities. An employer (or in this case the owner/operator of a public facility) discriminates against a qualified individual on the basis of a disability when it does not make "reasonable accommodations to the known physical or mental limitations" of the individual unless the employer can demonstrate that the accommodation would "impose an undue hardship on the operation" of its business. 42 U.S.C. § 12112(b)(5)(A). To succeed on a failure to accommodate claim, a plaintiff must prove: (1) that he is "disabled" within the meaning of the ADA; (2) that he is "otherwise qualified" to perform the requirements of the job; and (3) that defendant refused to make a reasonable accommodation for his disability. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

---

[11] Plaintiff's claim under the Rehabilitation Act also fails because he cannot show that the decision to revoke his privileges was based *solely* on the basis of his alleged disabilities. *See Crocker v. Runyon*, 207 F.3d 314, 321 (6th Cir. 2000) (quoting *Burns v. City of Columbus, Dept. of Public Safety, Div. of Police*, 91 F.3d 836, 841 (6th Cir. 1996)) ("[U]nlike Title VII cases, where race or sex will almost never be an acceptable reason for an employment decision adverse to a qualified employee, the Rehabilitation Act permits an employer to make a decision because of a handicap if the handicap is not the sole reason for the decision.") By his own allegations and admissions, there were multiple reasons for the revocation of his privileges including: retribution by African-American doctors who were angry that Plaintiff complained about them (Badri Dep. at 212-213, 301-307), retaliation by Huron Hospital because Plaintiff complained about the quality of patient care to outside agencies (Badri Dep. at 213), and a desire by Huron staff to take over Plaintiff's nursing home business (Badri Dep. at 372-374). Similarly, the existence of multiple reasons for Plaintiff's discharge would preclude Plaintiff from recovering under the ADA, unless he could prove that "but-for" the alleged disability he would not have lost his privileges, inasmuch as mixed motive claims are not viable under the ADA. *See Serwatka v. Rockwell Automation, Inc*., 2010 U.S. App. LEXIS 948 (7th Cir. Jan. 15, 2010) (citing *Gross v. FBL Fin. Servs., Inc*., 129 S. Ct. 2343 (2009)).

Under this analysis, a plaintiff has the initial burden of proposing an accommodation and demonstrating that it is reasonable. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996). The burden of showing undue hardship rests with the employer. *Id.* The term "reasonable accommodation" may include "job restructuring [or] part-time or modified work schedules […]." 42 U.S.C. § 12111(9). A medical leave of absence can constitute a reasonable accommodation under appropriate circumstances. *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998).

Generally, a disabled employee's request for an accommodation triggers an employer's duty to participate in the interactive process to attempt to identify an appropriate accommodation. *EEOC v. Convergys Mgmt. Group,* 491 F.3d 790, 795 (8th Cir. 2007); *Hatchett v. Philander Smith College*, 251 F.3d 670, (8th Cir. 2001); *Sansom v. Cincinnati Bell Tel.*, 2009 U.S. Dist. LEXIS 96920, at *22-*23 (S.D. Ohio Oct. 19, 2009). *See Clark v. Whirlpool Corp.*, 109 Fed. Appx. 750, 755 (6th Cir. 2004). An employee need not make a request where the disability is obvious or otherwise known to the employer without notice to the employee. *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2nd Cir. 2008); *see* 42 U.S.C. § 12112(b)(5)(A).  It is not enough, however, for the employer to know the effects of the disability to trigger its duty to engage in the interactive process. *Van Compernolle v. City of Zeeland*, 2006 U.S. Dist. LEXIS 32963, at *39 (W.D. Mich. May 24, 2006) (citing *Hedberg v. Indiana Bell Tel. Co*., 47 F.3d 928, 932 (7th Cir. 1995)).

23

It is Defendants' position that Plaintiff never requested a reasonable accommodation. Defendants note that none of the communications that either Plaintiff or his office manager, Debbie Morgan, had with Huron after Huron began to investigate Plaintiff's behavior contained any such request.

Plaintiff insists, however, that he did impliedly make a request when Ms. Morgan submitted Dr. Badri's medical records and suggested that his unusual behavior was the result of Cushing's Syndrome. Alternatively, Plaintiff argues that no request was necessary because Defendants were aware of his disability, should have intuitively known that he was in need of an accommodation, and should have proactively "attempt[ed] to investigate and evaluate Dr. Badri's use of steroids and their affect [sic] on Dr. Badri's behavioral conditions." (Memo. in Opp. at 8.) As for the appropriate accommodation, Plaintiff suggests that Defendants should have forced him into a mandatory drug treatment program. (*Id*. at 7.)

The Court finds no evidence that Plaintiff made a request for a reasonable accommodation. From Ms. Morgan's letter to Chung, it is clear that Plaintiff's medical records were offered for the solitary purpose of explaining his actions. (Doc. No. 66, Ex. I, Morgan letter, December 9, 2003.) Indeed, the letter specifically stated that Plaintiff was "appropriately dealing with said problem." (*Id*.) Moreover, Plaintiff admits that he never told anyone at Huron Hospital that he no longer could perform procedures because of any incapacity (Badri Dep. at 179), never requested leave due to his impairments (Badri Dep. at 179), and never made any other request.

Notwithstanding the lack of a request, Plaintiff argues that Defendants were obligated to accommodate a known disability. There is evidence in the record that prior to receiving Dr. Lightbody's Report, Defendants suspected that Plaintiff's outbursts might be associated with steroid overuse. Dr. Chung testified that he suggested that Dr. Badri provide information to the MEC regarding his condition because it might explain his behavior. (Doc. No. 68, Exp. 4, Chung hearing testimony at 311-314.) Dr. Mars' neurological evaluation on November 23, 2003 was also suggestive of drug abuse. (*See* Lightbody Report at 1.)

The record also shows, however, that there was insufficient evidence from which Defendants could have substantiated that Dr. Badri was disabled due to his conditions and his steroid overuse. While the information supplied by Ms. Morgan was "suggestive of steroid over medication," it "did not include any psychological information," and, as such, did not provide an adequate basis from which to assess any possible impairment. (*See* Doc. No. 66, Ex. K, Memo from Dr. Chung.) It is, of course, the employee who bears the burden of providing sufficient information to establish that he has a qualifying impairment that requires accommodation. *See Convergys*, 491 F.3d at 796; *Sansom*, 2009 U.S. Dist. LEXIS 96920, at *23-*24.

The employer may also require the employee to submit to a medical examination. *Sansom*, 2009 U.S. Dist. LEXIS 96920, at *24. The report of Dr. Lightbody, which followed Dr. Lightbody's examination of Plaintiff, stated that Dr. Badri did not suffer from any lasting effects from steroid overuse; an opinion which was, in part, based upon Plaintiff's representation that he had weaned himself off the steroids.

25

(Lightbody Report at 2.) Dr. Lightbody further found "no sign of behavioral instability or emotional liability." (*Id*. at 3.)

Plaintiff argues that Defendants should have dug deeper to discover the true nature of his condition and, in the process, should have disregarded Dr. Lightbody's evaluation. Yet, it was Plaintiff who went out of his way to hide his condition from Defendants. Plaintiff testified that if he ever cancelled a procedure due to his condition, he would not have had the "audacity to just go and advertise [his] physical incapacity to everybody" (Badri Dep. at 165), but would have "used some excuse" or made up a reason other than incapacitation due to his disability.[12] (Badri Dep. 166.)  The record also shows that Plaintiff went to some lengths to hide the fact that he was even taking steroids and other prescription medication. (Badri Dep. at 88, 101-102, 154.)

There is no evidence that Defendants ignored a known disability. The fact that Defendants were concerned, based upon certain observations of Plaintiff's conduct and physical appearance, is not sufficient. Simply observing the effects of a possible disability does not trigger an employer's duty to engage in the interactive process. *Van Compernolle*, 2006 U.S. Dist. LEXIS 32963, at *39 (citing *Hedberg*, 47 F.3d at 932). "An employer is not required to speculate as to the extent of an employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998). Defendants had the right to substantiate

---

[12] He further testified that to have told anyone, including his patients, that he was having trouble, such as holding surgical instruments, would have been "professional suicide." (Badri Dep. at 483-84.) The problem with this approach is that it ignores the fact that the notice requirement of the ADA prevents employees from keeping their disability a secret. *See Brady*, 531 F.3d at 135 (internal citation omitted).

26

their concerns before they considered accommodations. They did so by requiring Plaintiff to submit to a psychological evaluation, the results of which led to the reasonable conclusion that Plaintiff was not disabled. Plaintiff challenges Dr. Lightbody's findings with expert testimony offered to show that Dr. Lightbody's assessment was inaccurate. However, the relevant inquiry is not whether Defendant's investigation was thoroughly accurate; rather, the only question before this Court is whether Plaintiff has come forward with evidence creating a genuine issue of material fact as to whether Defendant's failed to act in good faith during the interactive process. *See Hohider v. U.P.S.*, 574 F.3d 169, 187 (3d Cir. 2009). Plaintiff has failed to come forward with such evidence. Indeed, it is disingenuous of Plaintiff to suggest that Defendants should have dug deeper when the information they relied upon was, in part, based upon Plaintiff's own representation that he was no longer abusing steroids.[13]

As for the accommodation Plaintiff now claims Defendants should have provided, Plaintiff has come forward with absolutely no evidence to support a finding that Defendants were required to force him into a treatment program for his drug addiction. Nor is the Court aware of any support for the notion that such an accommodation would be reasonable. Plaintiff vaguely points to the Joint Commission for Accreditation of Healthcare Organizations (JCAHO), but fails to identify any

---

[13] Dr. Chung testified that treatment for Cushing's Syndrome involved stopping the use of steroids. (Doc. No. 68, Ex. 5, at 115.) Indeed, Plaintiff testified that once he weaned himself off the steroids his Cushing's Syndrome symptoms ceased. (Badri Dep. at 161.)

27

regulation that would require such action.[14] (*See* Reply, Ex. AA, Declaration of Gus Kious at ¶ 7, stating that no such regulation exists). Consequently, Plaintiff cannot meet his burden of proving that his "requested" accommodation was reasonable.

Ultimately, the Court must conclude that Defendants are entitled to judgment as a matter of law on Plaintiff's failure to accommodate claim. As observed above, Plaintiff cannot establish that he is a qualified individual with a disability. Further, even if he could make such a showing, Plaintiff cannot point to disputed material facts which could demonstrate that Defendants failed to engage in good faith in the interactive process. *See Lockard v. General Motors Co.*, 52 Fed. Appx. 782, 788 (6th Cir. 2002) ("To bear responsibility for a failure to accommodate, an employer must be responsible for a breakdown in the interactive process.") It is clear that Plaintiff never requested an accommodation, and Defendants had no reason to believe that Plaintiff had an obvious disability that required accommodation. Finally, the Court cannot find that a forced treatment program, which the record would suggest that Plaintiff was unwilling to consider,[15] would have constituted a reasonable accommodation.

### Immunity Under HCQIA

The focus of Plaintiff's state law claims is the peer review process that ultimately led to the revocation of all of Dr. Badri's medical privileges at Huron Hospital.

---

[14] Moreover, the JCAHO does not create a cause of action for physicians based on a health care organization's failure to follow the standards. *See Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 2006 U.S. Dist. LEXIS 27440 (E.D. La. May 9, 2006) (acknowledging that JCAHO standards do not provide a negligence cause of action and provide no evidence of violations of a standard of care without an underlying negligence action).

[15] Notwithstanding the requirement in the Code of Conduct that Dr. Badri submit to whatever treatment was recommended in the psychiatric evaluation, Dr. Badri rejected Dr. Lightbody's suggestion that he participate in ongoing psychotherapy. (Lightbody Report at 3.)

Defendants argue that they are entitled to immunity under the Health Care Quality Improvement Act (HCQIA) for their part in the peer review process. Plaintiff believes that a grant of immunity would be inappropriate, complaining that the review process was unreasonable.

The purpose of the HCQIA is to provide "effective peer review and interstate monitoring of incompetent physicians, and to grant qualified immunity from damages for those who participate in the peer review activities." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 467 (6th Cir. 2003) (citing 42 U.S.C. § 11101.) If a "professional review activity" meets certain criteria for reasonableness, then those participating in the review "shall not be liable in damages under any law of the United States or any State [...] with respect to the action." 42 U.S.C. § 11111(a)(1). There is no dispute that the decision to revoke Dr. Badri's privileges was a "professional review action" and the peer review process was a "professional review activity," as those terms are defined by the HCQIA.[16]

---

[16] The HCQIA defines "professional review action" as:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9). A "professional review activity" is defined as "an activity of a health care entity with respect to an individual physician

> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity;
> (B) to determine the scope or conditions of such privileges or membership; or
> (C) to change or modify such privileges or membership.

§ 11151(10). Professional review activities are generally precursors to professional review actions. *Singh v. Blue Cross/Blue Shield of Mass.*, 308 F.3d 25, 37-38 (1st Cir. 2002).

To qualify for immunity, an individual or entity must demonstrate that the action was taken:

(1) in the reasonable belief that the action was in furtherance of quality healthcare;

(2) after a reasonable effort to obtain the facts of the matter;

(3) after adequate notice and hearing procedures are afforded to the physician involved or such other procedure are fair to the physician under the circumstances; and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effect to obtain the facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). *See Singh v. Blue Cross/Blue Shield of Mass.*, 308 F.3d 25, 37-38 (1st Cir. 2002); *Meyers,* 341 F.3d at 467.

Upon the proper showing, immunity is available to:

(A)  the professional review body;

(B)  any person acting as a member or staff to the body;

(C)  any person under a contract or other formal agreement with the body, and

(D)  any person who participates with or assists the body with respect to the action.

(E) 42 U.S.C. § 11111(a)(1). The Court finds that all Defendants, including Huron Hospital, are eligible upon a proper showing to receive HCQIA

30

(F) immunity for the activities in the peer review process.[17]

"The HCQIA creates a rebuttable presumption of immunity, forcing the plaintiff to prove that the defendant's actions did not comply with the relevant standards." *Meyers*, 341 F.3d at 467-468 (citing § 11112(a)). This rebuttable presumption creates an "unconventional" summary judgment standard, *Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832, 849 (3rd Cir. 1999), that seeks to answer the question: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendant's actions are outside the scope of § 11112(a)?" *Meyers*, 341 F.3d at 468 (internal citation omitted). *See Brader*, 167 F.3d at 839. As such, Plaintiff must overcome the presumption by showing that the review process was unreasonable. *Meyers*, 341 F.3d at 468.

Plaintiff argues that Defendants cannot meet any of the elements for establishing immunity. He fails, however, to raise any genuine issues of material fact that would overcome the presumption of immunity.

**The Action was Taken in the Reasonable Belief that it Would Further the Quality of Health Care**

The "reasonable belief" standard is satisfied if "the reviewers, with the information available to them at the time of the professional review action, would

---

[17] The HCQIA defines "professional review body" to include "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity." 42 U.S.C. § 11151(11). Huron Hospital is both a health care entity and a professional review body.

reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1323 (11th Cir. 1994) (internal citation omitted). The professional review need not result in the actual furtherance of the quality of health care so long as it was undertaken with a reasonable belief that such improvement would result. *See Brader*, 167 F.3d at 840 (quoting *Mathews*, 87 F.3d at 635) ("The 'reasonable belief' standard in § 11112(a)(1) will be satisfied 'if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.'")

Defendants insist that they reasonably acted to improve the quality of health care by taking steps to discipline a physician whose behavior toward nurses, staff, and patients was abusive and disruptive. In *Meyers*, the Sixth Circuit approved of the district court's observation that "'quality health care' is not limited to clinical incompetence, but includes matters of general behavior and ethical conduct." *Id.* at 468 (affirming the district court's grant of immunity to reviewers who revoked a physician's privileges for disruptive behavior, "temper tantrums," and an inability to get along with staff). *See Everhart v. Jefferson Parish Hosp. Dist. No. 2*, 757 F.2d 1567, 1573 (5th Cir. 1985) ("Quality patient care demands that doctors possess at least a reasonable 'ability to work with others.'")

While Plaintiff maintains, without support, that the action taken was unreasonable, Plaintiff concedes that his behavior was inappropriate and disruptive. (Badri Dep. at 450, 555-56, 568, 617.) He further admits that it was appropriate for the

MEC to require him to sign the Code of Conduct (Badri Dep. at 565-566), and that he does not question the motives of the MEC in asking him to sign it. (Badri Dep. at 568-569). Finally, he acknowledges that his subsequent behavior violated the Code (Badri Dep. at 616, 664, 701), and warranted the action taken by Defendants. (Badri Dep. at 519-522.) In the absence of any facts calling into question the reasonableness of Defendants' belief, Plaintiff's own admissions compel a finding that Defendants had a reasonable belief that the action would further quality health care. *See, e.g., Meyers*, 341 F.3d at 469.

**The Action was Taken after a Reasonable Effort to Obtain the Facts**

Plaintiff argues that Defendants did not make a reasonable effort to obtain the facts because they should have questioned Dr. Lightbody's report, and should have dug deeper to ascertain the true nature of his ailments. In particular, he turns to the testimony of his expert, Dr. Bertschinger, who opines that Defendants were negligent for having observed Dr. Badri's behavior and not insisted on a more thorough psychiatric examination. (Memo. in Opp. at 6, Ex. 3, Bertschinger Affidavit at ¶¶ 9, 13.)

As to the second prong of the test, the "relevant inquiry under § 11112(a)(2) is 'whether the totality of the process leading up to the [Defendants'] professional review action […] evidenced a reasonable effort to obtain the facts of the matter." *Brader*, 167 F.3d at 841 (quoting *Matthew v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3rd Cir. 1996))). The HCQIA does not require a comprehensive examination to satisfy this inquiry. *Myers*, 341 F.3d at 468. Even assuming that Dr. Lightbody's report was inadequate, Defendants did not rely solely upon this piece of evidence. All along the

way, participants of the review process had the advantage of the observations of staff members who witnessed what Plaintiff admits was inappropriate conduct. The various panels heard both lay and expert testimony regarding Plaintiff's misconduct and his medical condition. Also, Plaintiff was represented by counsel throughout the process, and was afforded an opportunity to make a record. Finally, Plaintiff was permitted to approve the panel of physicians who presided over the Fairness Hearing. Under these circumstances, Plaintiff's concern over the Lightbody Report, even if valid, are insufficient to rebut the presumption that Defendants made a reasonable effort to ascertain the facts of the matter before the professional review action was taken. *See, e.g., Brader*, 167 F.3d at 841 (Attack upon expert report insufficient to rebut reasonableness of efforts to investigate facts regarding the loss of hospital privileges).

**Badri Received Adequate Notice and Hearing Procedures**

The third element of the HCQIA immunity test asks the question whether adequate notice and hearing procedures were afforded to the physician involved. *Meyers*, 341 F.3d at 469; 42 U.S.C. § 11112(a)(3). Plaintiff argues that Defendants cannot meet this third prong because they deviated from the JCAHO standards by failing to immediately suspend Plaintiff's privileges and then force him into a mandatory detoxification program, and because he did not receive a copy of Dr. Lightbody's Report until immediately prior to the Fairness Hearing. These arguments fail for three reasons.

First, as previously noted, Plaintiff cannot point the Court to any JCAHO regulation that would have required Defendants, under the circumstances, to compel Plaintiff to participate in a drug rehabilitation program. Second, Dr. Badri admits that he

received notice of the MEC's decision, which was issued after the presentation of "numerous witnesses, oral argument, and submission of post-hearing briefs." (Am. Compl. at ¶ 27.) Third, Plaintiff admits that Defendants did not violate Huron's bylaws at any point during the review process. (Badri Dep. at 462-463, 513, 564.)

However, even if Defendants should have made Dr. Badri aware of the contents of Dr. Lightbody's Report at an earlier point in time, such a fact would not create a genuine issue of fact warranting a trial. The HCQIA sets out "safe harbor" procedures, which satisfy the "notice and procedures" requirement of § 11112(a)(3). *See* § 11112(b). The notice and process afforded Plaintiff falls neatly within this safe harbor. Specifically, Plaintiff was given notice of each professional review action to be taken, informing him of his due process rights at each level. (*See* Doc. No. 66, Ex. H, Ex. L, Ex. S, Ex. U.) Plaintiff does not deny that the hearings, themselves, conformed to the requirements of § 11112(b)(3): the Fairness Hearing was conducted before a panel of Plaintiff's own choosing, Plaintiff was represented by counsel, and he was allowed to make a record, present evidence and submit a written statement at the end of the hearing. *See, e.g., Brader*, 167 F.3d at 842 (finding adequate notice and process under similar circumstances).

It is clear from Plaintiff's deposition that his true beef is with the fact that he believes that Defendants should have approached him in person before initiating the peer review process. (Badri Dep. at 200, 388-89, 444-45, 447, 510-511, 513, 568-569, 622-23). In response to the question of whether the Fair Hearing was "fair," Plaintiff answered: "No. [] Because at no point in time did anybody from that administration or

35

medical staff appreciate the fact that there was nobody that ever, ever confronted me with the right diagnosis face-to-face, took a moment of their time to sit down with me, identify my problem, telling me what they were feeling about me and let me know in details as to what I need to do in a friendly way [...]."[18] (*Id.* at 388.) Despite his dissatisfaction with the way he was approached, Plaintiff can point to nothing in the bylaws (Badri Dep. at 462-463, 513, 564) or case law that would have required Defendants to unofficially confront Plaintiff before resorting to the formal review process. Moreover, the fact that the contents of Dr. Lightbody's Report may not have been made known to Plaintiff until immediately prior to the Fairness Hearing, without more, cannot establish that reasonable jurors could have found that the notice or review process was inadequate. *See Meyers*, 167 F.3d at 842 ("The HCQIA does not require that a professional review body's entire course of investigation conduct meet particular standards in order for it to be immune from liability for its ultimate decision.")

**The Belief that the Revocation of Privileges was Warranted**

The final inquiry under § 11112(a) is "whether the professional review action was taken in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain those facts." *Meyers*, 167 F.3d at 843. The analysis of the fourth factor tracks closely the analysis under § 11112(a)(1). *Id.*

Defendants need look no further than Plaintiff's own admission to prove the final prong of the HCQIA immunity test. He admits that there was sufficient evidence

---

[18] Plaintiff further explained: "I'm not saying they followed or did not follow rules more than I'm say that I deserved a little more [than] what they showed me, which I perceived as a very hostile attitude towards me." (*Id.* at 513.)

before the MEC to support its decision. (Badri Dep. at 518-519.) While he may take issue with Dr. Lightbody's Report, "a plaintiff's showing 'that [the] doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding' does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process." *Brader*, 167 F.3d at 843 (quoting *Imperial v. Suburban Hospital Assoc*., 37 F.3d 1026, 1030 (4th Cir. 1994)). Plaintiff has failed to show that the facts were "so obviously mistaken or inadequate as to make reliance on them unreasonable." *Matthews*, 87 F.3d at 638.

In view of the MEC's findings that Plaintiff's behavior was abusive or disruptive, a fact which Plaintiff does not deny, there is no genuine issue as to whether Defendants' decision to revoke Dr. Badri's privileges was taken in the reasonable belief that it was warranted by the facts. *See, e.g., Meyers*, 341 F.3d at 471. Indeed, Plaintiff has failed to come forward with any evidence that would create a genuine issue of fact as to whether a reasonable jury could conclude that Defendants' actions were outside the scope of § 11112(a). *See id.* at 468. For this reason, the Court finds that Defendants are entitled to immunity under the HCQIA.[19]

---

[19] Plaintiff also argues that immunity is precluded because Defendants' actions during the review process were in response to the fact that Plaintiff had filed complaints with the U.S. Department of Health and Human Services and other agencies and cites the decision of *Brader v. Allegheny Gen. Hosp*., 64 F.3d 869, 879 (3rd Cir. 1995). (Memo. in Opp. at 13.) Plaintiff's reliance on *Brader* is misplaced. This decision involved a ruling on a motion for judgment on the pleadings, wherein the court determined that the plaintiff had plead sufficient allegations of whistleblowing to overcome the motion to dismiss. *Id.* at 870. On the subsequent summary judgment motion, however, the same court found that the plaintiff had not come forward with any material evidence supporting his allegations, and held that the defendants were entitled to immunity. *Brader*, 167 F.3d 832 (3rd Cir. 1999). Likewise, this Court has already determined that Plaintiff has failed to support his whistleblower theory with any evidence. As such, this argument cannot disturb the presumption that the peer review process was reasonable.

***Plaintiff's State Law Claims***

Even without a grant of immunity to Defendants, Plaintiff's state law claims would not survive summary judgment. Plaintiff raises state law claims for negligence in peer review, defamation, breach of contract, tortuous interference with existing and prospective contract relationships, promissory estoppel, intentional infliction of emotional distress, and civil conspiracy. Each claim will be addressed in turn.

### Negligence in Peer Review

By this claim, Plaintiff alleges that Defendants breached a duty of care owed under the HCQIA by subverting the peer review process. (Am. Compl. ¶¶ 63-64.) Defendants insist that the HCQIA does not provide for a private cause of action by a physician for negligence in the peer review. The Court agrees. Courts have consistently held the HCQIA "does not afford a physician a private right of action." *Sinoff v. Ohio Permanente Med. Group*, 146 Ohio App. 3d 732, 739 (Ohio Ct. App. 8th Dist. 2001). *See Singh*, 308 F.3d at 45 n.18; *Wayne v. Genesis Med. Ctr.*, 140 F.3d 1145, 1148 (8th Cir. 1998); *Bok v. Mut. Assur.*, 119 F.3d 927, 928-29 (11th Cir. 1997).

Plaintiff challenges these rulings, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 284 (1996). In *Dresher*, a patient brought suit against a hospital and a surgeon claiming that damages she sustained as the result of a surgery performed at the hospital were, in part, the result of negligent peer review of the surgeon. Claims brought by patients for negligent credentialing of a physician are fundamentally different than negligence claims brought by a physician under HCQIA. This Court finds no evidence that Congress intended to create a cause of action for the benefit of physicians, and joins

other courts in concluding that "the HCQIA does not explicitly or implicitly create a private cause of action for physicians subjected to peer review." *Singh*, 308 F.3d at 45 n.18.

Of course, even if such a cause of action existed, summary dismissal would be appropriate because, as the Court has previously determined, Plaintiff has failed to come forward with any facts that create a genuine issue of material fact as to the reasonableness of the peer review process under HCQIA.

**Defamation**

Defendant also claims that Huron Hospital published a materially false report regarding Plaintiff's surgical outcomes. (Am. Compl. at ¶ 67.) He further alleges that Defendants published defamatory statements to third parties concerning Plaintiff's character, reputation, and clinical competence. (Am. Compl. at ¶ 69.)

The essential elements of a defamation claim are as follows: (1) the defendant made a false statement; (2) that was defamatory in nature; (3) and published to a third party; (4) the unprivileged publication of that statement caused injury to the plaintiff; and (5) the defendant acted with the requisite degree of fault. *See Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 81 Ohio App. 3d 591, 601 (Ohio Ct. App. 9th Dist. 1992).

Plaintiff has neglected to come forward with any facts that would support his defamation claim. Indeed, he has failed to identify any materially false report Huron Hospital published. He has also failed to identify any oral or written statements made by the individual defendants that constituted defamation, and admits that he is unaware of

any untrue statements made by any of these individuals. (Badri Dep. at 241, 243-244.) He cannot satisfy any of the necessary elements for his defamation claim. Consequently, this claim would not survive summary judgment.

### Breach of Contract

By his seventh cause of action, Plaintiff maintains that Huron Hospital's bylaws constituted a contract with the Hospital, and that this "contract" was breached by Huron. (Am. Compl. at ¶ 75.) This claim fails for two reasons. First, Huron's bylaws do not constitute a binding contract. Hospital "bylaws can form a binding contract between the doctor and a hospital but only where there can be found in the bylaws an intent by both parties to be bound." *Munoz v. Flower Hosp.*, 30 Ohio App. 3d 162, 165-166 (Ohio Ct. App. 6th Dist. 1985). Here, Huron Hospital's bylaws clearly provide that "[n]either membership on the staff nor these Bylaws, rules and regulations constitute a contract and neither are intended or should be construed to confer any contractual rights upon an appointee or member." (Doc. No. 66, Ex. V, Huron Hospital Medical Staff Bylaws, Rules and Regulations at 12.) Second, Plaintiff admits that Defendants did not violate Huron's bylaws at any point during the peer review process. (Badri Dep. at 462-463, 513, 564.) Thus, Plaintiff can point to no evidence that would, if believed, support his breach of contract claim.

### Promissory Estoppel

To establish a claim for promissory estoppel under Ohio law, a plaintiff must establish the existence of a clear and unambiguous promise upon which it would be reasonable and foreseeable to rely and actual reliance on the promise to the determent of

one who relied. *Cox v. True N. Energy*, 524 F. Supp. 2d 927, 946 (N.D. Ohio 2007); *Patrick v. Painesville Commer. Props.*, 123 Ohio App. 3d 575, 583 (Ohio Ct. App. 11th Dist. 1997). In his Amended Complaint, Plaintiff alleges that Huron Hospital's bylaw promised "certain specific substantive and procedural rights" that Plaintiff relied upon to his detriment. (Am. Compl. at ¶ 80.) As was the case with Plaintiff's contract claim, his promissory estoppel claim must fail because the bylaws do not create a binding contract between Huron and its staff physicians, and because Plaintiff concedes that Defendants did not violate any bylaws in revoking his privileges.

### Tortious Interference with Contract

Plaintiff also claims that Defendants interfered with existing and prospective contractual relationships. In particular, Plaintiff alleges that Huron Hospital and Defendant Jones interfered with his nursing home business by advising one particular nursing home that Plaintiff no longer held privileges at Huron Hospital. (Am. Compl. at ¶ 56.) He concludes that the "[l]oss of the Plaintiff's hospital privileges, engineered by these Defendants through bad-faith peer review, was the direct and proximate cause of Plaintiff's unavoidable breach (and the resulting pecuniary loss) of those existing [nursing home] contracts and their resulting termination, as well as Plaintiff's inability to obtain prospective economic advantage through similar future contracts with patients, hospitals and managed care entities." (*Id*. at ¶ 59.)

The elements of a claim for tortuous interference with contract claim are: "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of

justification; and (5) resulting damages. *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St. 3d 171, 175 (1999). Under Ohio law, the interference must be both intentional and improper. "Even if the actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified." *Id*.

Plaintiff insists that "there is a genuine issue of material fact as to whether the Defendants' motivation for terminating Dr. Badri's privileges in fact was the cause of financial damage to Dr. Badri's medical practice." (Memo. in Opp. at 17.) Aside from his suspicion, however, Plaintiff offers no facts that would support a jury finding that improper motives did, indeed, compel Defendants to revoke his privileges. Moreover, Plaintiff concedes that evidence of his inappropriate behavior was sufficient to justify the MEC's revocation of privileges. As for the only specific instance of "interference" identified by Plaintiff, the trip to the Candlewood Nursing Home by Defendants Kious and Jones, Plaintiff admits that Dr. Kious truthfully told the nursing home staff that his privileges had been terminated and that patients, therefore, would have to be referred to Huron Hospital by someone else. (Badri Dep. at 241-243.) No juror could infer an improper motive from this true statement. Plaintiff has, therefore, failed to establish a genuine issue of material fact with respect to his tortuous interference claim.

### Intentional Infliction of Emotional Distress

In order to support a claim for the tort of intentional infliction of emotional distress under Ohio law, four elements must be proved: (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) that the actor's conduct was

extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community; (3) that the actor's actions were the proximate cause of the plaintiff's injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34 (Ohio Ct. App. 8th Dist. 1983). *See Ashcroft v. Mt. Sinai Med. Ctr.*, 68 Ohio App. 3d 359, 366 (Ohio Ct. App. 8th Dist. 1990). To be "extreme" and "outrageous," conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union No. 20, Teamsters,* 6 Ohio St. 3d 369, 375 (1983).

Plaintiff fails to point to any specific conduct on the part of Defendants that he believes rises to the level of extreme and outrageous. Rather, he merely relies upon his belief that the "Defendants' actions against [him] were intentional, and would shock the conscience of a civilized community and exceed the bounds of decency by failing to reasonably accommodate [his] disabilities and instead force upon [him] a process not used on other physicians causing [him] severe mental anguish." (Memo. in Opp. at 17.) For the reasons that Plaintiff cannot prove his claims of disability discrimination, his claim for intentional infliction of emotional distress would similarly fail. *See Hillman v. Safeco Ins. Co. of Am.*, 190 F. Supp. 2d 1029, 1039 (N.D. Ohio 2002).

**Conspiracy**

Finally, Plaintiff claims that all Defendants conspired to revoke his hospital privileges. "'Civil conspiracy' has been defined as 'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transamerica Premium Ins. Co*., 72 Ohio St. 3d 415, 419 (1995) (quoting *LeFort v. Century 21 Maitland Realty Co*., 32 Ohio St. 3d 121, 126 (1987)). In opposition to summary judgment, Plaintiff argues that Defendants Kious, Lozar and Suster "did engage in a malicious combination of two or more persons to injure Dr. Badri by engaging in the negligent peer review process, which resulted in Dr. Badri's termination." (Memo. in Opp. at 16.) Yet, he fails to offer any facts that, if proven at trial, would establish that Defendants' individual actions relative to the peer review process were undertaken as part of a shared conspiracy to injure him or deprive him of any property. Summary judgment in favor of Defendants, therefore, would be appropriate on this claim, as well.

***Motion for Sanctions***

Defendants have also filed a motion for sanctions (Doc. No. 73) against Plaintiff for failure to comply with the Court's October 27, 2009 Order requiring Plaintiff to respond to Defendants' discovery requests relating to damages. (*See* Doc. No. 60.) In response to a prior motion for sanctions, the Court ordered Plaintiff to supply Defendants with a written itemization of each category of documents requested and provide all non-privileged documents requested in Defendants' discovery requests. In particular, the Court directed Plaintiff to produce his tax returns from 2000 and 2008. According to

Defendants' latest discovery motion, Plaintiff has failed to produce any of the requested discovery. By their motion, Defendants seek to preclude Plaintiff from introducing at trial any evidence of economic harm.

Because the Court has dismissed all claims with prejudice on summary judgment, the Court finds that Defendants' request to preclude all evidence of economic damages at trial is moot. Defendants' motion for sanctions is, therefore, denied (as moot).

*Motion to Withdraw as Counsel*

Plaintiff's counsel, Marc Dann, has filed a motion to withdraw as counsel, citing irreconcilable differences with Dr. Badri and Dr. Badri's office manager, Debbie Morgan. (Doc. No. 78.) The Court hereby grants the motion. Prior to withdrawing, counsel shall advise Plaintiff, in writing, of his appellate rights and the time table for filing an appeal from the Court's ruling on summary judgment.

## IV.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** in its entirety, and all claims in the Amended Complaint are dismissed against all Defendants. Defendants' motion for sanctions is **DENIED** as moot, and Plaintiff's counsel's motion to withdraw is **GRANTED**. Counsel for Plaintiff is directed to advise Plaintiff in writing of his appellate rights and the time table for filing

an appeal from the Court's ruling on summary judgment. This case is dismissed.

**IT IS SO ORDERED**.

Dated: February 10, 2010

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**